**Calvin J. SMITH, Plaintiff-Appellant,**

v.

**TRANS–WORLD DRILLING COMPANY, Defendant-Appellee.**

**No. 84–3870**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Sept. 30, 1985.

Rehearing Denied Oct. 31, 1985.

Roberts, Katz, Baudier & Broussard, Martin L. Broussard, Jr., New Orleans, La., for plaintiff-appellant.

Deutsch, Kerrigan & Stiles, Christopher Tompkins, Howard L. Murphy, New Orleans, La., for defendant-appellee.

Before REAVLEY, TATE, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

This is an appeal from a judgment denying plaintiff Calvin Smith's claims against defendant Trans-World Drilling Company (Trans-World) for negligence under the Jones Act, 46 U.S.C. § 688, and under the general maritime law of unseaworthiness. We reverse the trial court's denial of Smith's directed verdict motion on the negligence claim, we affirm the trial court's denial of Smith's directed verdict motion on the unseaworthiness claim, and we remand for further proceedings in accordance with this opinion.

## I. FACTS

Smith, a roustabout, was injured on June 26, 1982, when he fell while working on Trans-World's drilling rig number forty-seven.[1] Smith fell from a height of ten to twelve feet while descending from an engine room roof on which he had been working, striking his back and head on a concrete deck. After a helicopter transported Smith to a hospital, he underwent three weeks of in-patient treatment and therapy as well as subsequent out-patient treatment.

Smith's fall occurred as he was attempting to cross from the engine room roof to the lower nearby roof of a storage shed. The engine room roof was constructed of several tin panels bolted together on a slight incline to form a peak. The engine room was separated from the storage shed by an open-air gap of thirty-three inches. A twelve inch diameter exhaust pipe extended from the engine room wall about eighteen inches below the edge of the sloping roof across this gap and connected to a large metal tubular muffler unit that rested atop the storage shed's flat roof. There was no railing on the pipe nor on the engine room roof. The supply shed roof had around its edge a forty-five inch high aluminum railing, the top of which was on an even plane with the top of the exhaust pipe.

Both parties agree that the exhaust pipe was used by roustabouts to go to and from the engine room roof. According to the uncontradicted testimony of two of Trans-World's witnesses, a fellow roustabout and a crane operator, the exhaust pipe was often so used. The fellow roustabout testified that the exhaust pipe was used as a means of going to or from the engine room roof up to four or five times a week.

Smith's fall occurred as he stepped on the exhaust pipe. At the time, Smith was one of four roustabouts who were removing roof panels from the engine room roof. As it began to rain, they covered the open portion of the roof with a canvas tarp and began to descend by use of the exhaust pipe as a walkway to go from the engine room to the supply shed roof. Smith was the last of the four to descend because he had paused to secure the tarp. When he stepped on the exhaust pipe, Smith fell as he "was reaching for a railing hoping some was there."

 Smith filed suit for damages against Trans-World for Jones Act negligence, for unseaworthiness, and for maintenance and cure under the general maritime law. Trans-World denied these claims and affirmatively pleaded that Smith's injuries were caused or contributed to by his own fault. At a jury trial after the close of all the evidence, Trans-World moved for directed verdict on the negligence and unseaworthiness claims on the ground of insufficient evidence, and on the maintenance and cure claim on the ground that Smith had reached maximum cure. Smith then also moved for directed verdict on the negligence, unseaworthiness, and maintenance and cure claims. The motions were denied. The jury returned verdicts for Trans-World on the negligence and the unseaworthiness claims, and found that Smith had reached maximum cure. The jury did not answer the interrogatories as to Smith's contrib-

---

1. The parties stipulated that Smith was a seaman and that the rig, a semisubmersible mobile offshore drilling rig operating in the Gulf of Mexico, was a vessel.

utory negligence or as to damages. The trial court entered judgment for Trans-World. Smith did not move for judgment n.o.v. or for new trial. Smith now appeals the denial of his directed verdict motion on the negligence and unseaworthiness claims.[2]

## II. STANDARD OF REVIEW

A threshold question exists as to whether this Court may examine the evidence for sufficiency notwithstanding Smith's failure to move for judgment n.o.v. under Fed.R.Civ.P. 50(b). Trans-World argues that such failure precludes examination of the sufficiency of the evidence upon which the jury's verdict was based, and cites *Delchamps, Inc. v. Barkin*, 429 F.2d 417, 418 (5th Cir.1970). Trans-World suggests that Smith's motion for directed verdict is inadequate by itself to preserve issues of the sufficiency of the evidence.

We disagree. While *Delchamps*, as well as the case cited on this point in *Delchamps, Parker v. American Oil Co.*, 327 F.2d 987 (5th Cir.1964), recite the proposition that an appellate court may not test the evidence for sufficiency absent a motion for judgment n.o.v., closer examination reveals that in both cases the verdict loser also failed to move for directed verdict.[3] Both cases recognize that a directed verdict motion, such as the one made by Smith, is adequate to preserve sufficiency of evidence issues on appeal. The prerequisite for testing the sufficiency of the evidence on appeal is a proper motion at trial for a directed verdict. *See, e.g., Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 297 (5th Cir.1978); *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1037–38 (5th Cir.1970), *cert. denied*, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); 9 C.

Wright & A. Miller, *Federal Practice and Procedure* § 2536 (1971).

We must next determine the proper standard of review of the denial of Smith's directed verdict motion. This Court, in *Springborn v. American Commercial Barge Lines, Inc.*, 767 F.2d 89, 100 (5th Cir.1985), has now determined that the proper standard of review of a seaman's motion for directed verdict on a Jones Act negligence claim is the "reasonable man" standard of *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). The *Boeing* standard is also appropriate for a seaman's directed verdict motion on an unseaworthiness claim. *See Springborn*, 767 F.2d at 96; *Robin v. Wilson Brothers Drilling*, 719 F.2d 96, 98 (5th Cir.1983). Under *Boeing*, Smith would be entitled to a directed verdict if the facts and inferences point so strongly in his favor that reasonable men could not arrive at a contrary verdict.

## III. NEGLIGENCE PER SE

Applying this standard of review to the facts presented at trial, we conclude that Trans-World was negligent as a matter of law because its failure to install a railing along the exhaust pipe from which Smith fell constituted negligence *per se*. Five elements of a Jones Act negligence *per se* claim are the following: (1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the regulations, (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, and (5) causation. *Reyes v. Vantage S.S. Co., Inc.*, 558 F.2d 238, 242–44 (5th

---

**2.** Smith also asks for a remand for determination of damages on the negligence and unseaworthiness claims, but it is unclear whether Smith challenges the denial of his directed verdict motion on maintenance and cure. In any event, sufficient evidence at trial supports the jury's finding that Smith had reached maximum cure when Trans-World stopped making maintenance and cure payments. Smith's own physi-

cian, called as a witness by Smith, testified that he had discharged Smith on November 8, 1982, as ready to resume work.

**3.** In *Parker*, the Court did not explicitly so state, but cited two authorities which state that the directed verdict motion is crucial. *See* 327 F.2d at 988.

Cir.1977) (*Reyes* I), *modified*, 609 F.2d 140 (1980) (*Reyes* II). Because, as shown below, Smith met these elements, the trial court erred in denying Smith's directed verdict motion.

The first element of the negligence *per se* test, that a violation of Coast Guard regulations occurred, was established at trial by uncontradicted evidence. Coast Guard regulations require mobile drilling rigs to have a railing on at least one side of each "passageway" that is less than six feet wide.[4] As already noted, two of Trans-World's witnesses testified without contradiction that the exhaust pipe was used for passage to and from the engine room roof. Smith and his fellow workers used the pipe for passage from the engine room roof at the time of his fall. We conclude that no reasonable man could find that the pipe was not a "passageway" within the meaning of the regulations. Thus Trans-World violated the regulations.[5]

The next two elements, that Smith was an intended beneficiary of the regulations, and that his injury was of the type against which the regulations were intended to protect, are easily met. Railings are to provide safe passageways for workers on the rig, and Smith was a roustabout working on the rig at the time of his accident. The purpose of railings is obviously to prevent falls by persons using passageways, and Smith's injuries were a result of such a fall. It is unreasonable to conclude otherwise than that the regulations were intended to protect a person such as Smith from a fall

such as the one he had. *See Reyes* I, 558 F.2d at 243.

There is no indication in the record that the regulatory violation was excused or otherwise justified. Witnesses for Trans-World testified that work on the engine room roof was routine, and there was no showing of a present emergency or other condition where installation of a railing would have been more dangerous than violation of the regulations. Indeed, Trans-World contends that the railing was not installed only because the exhaust pipe was considered already safe; this reasoning cannot excuse the violation.

Finally, we conclude that, for the purposes of his Jones Act claim, the lack of a railing was a cause of Smith's fall as a matter of law. As the trial court instructed the jury, without objection by either side, the question of causation in a Jones Act claim turns on whether the acts or omissions of Trans-World contributed to Smith's injury in even the slightest degree. *See Sanford Brothers Boats, Inc. v. Vidrine*, 412 F.2d 958, 962 (5th Cir.1969); *see also Reyes* II, 609 F.2d at 146 (reaffirming the *Reyes* I interpretation of *Sanford*). The negligence of Trans-World in failing to provide a railing along the exhaust pipe must have contributed to Smith's fall, because neither side disputed Smith's contention that he was on the exhaust pipe when the fall occurred. For Trans-World to retain its jury verdict, we would have to conclude that the lack of a railing at the precise spot of Smith's fall could not have had the slightest effect in contributing to the cause of the fall. We find that no

**4.** Smith's witness George Blann, an expert on maritime safety, testified (without contradiction on *this* issue) that the lack of a railing on the exhaust pipe constituted a violation of safety standards. We take judicial notice of the regulation in question:
Storm rails.
Each unit must have a storm rail in the following locations:
(a) On each deckhouse side that is normally accessible.
(b) On each side of each passageway that is wider than 1.83 meters (6 feet).
(c) On at least one side of each passageway that is less than 1.83 meters (6 feet) wide.

46 C.F.R. § 108.221 (1984).
Although the Coast Guard had certified the rig, this factor is irrelevant given the lack of a factual predicate. There was no evidence in the record suggesting that the Coast Guard was aware of the use of the exhaust pipe as a passageway.

**5.** Smith also urged that another regulation, requiring a ladder between each "weather deck," was violated. *See* 47 C.F.R. § 108.167 (1984). However, cross-examination of the expert witness Blann provided evidence from which a reasonable man could conclude that the engine room roof was not a "deck."

reasonable man could so conclude.[6] Therefore, we conclude that Trans-World was negligent as a matter of law.

### IV. UNSEAWORTHINESS PER SE

Unseaworthiness, like Jones Act negligence, can be the *per se* result of a regulatory violation.[7] *See Phipps v. S.S. Santa Maria*, 418 F.2d 615, 616–17 (5th Cir.1969). However, a crucial distinction between the two claims is the differing standard of causation required to find liability. While Jones Act negligence is a legally sufficient cause of injury if it played any part, no matter how small, in bringing about the injury, the plaintiff must meet a more demanding standard of causation in an unseaworthiness claim. *See, e.g., Rogers v. Eagle Offshore Drilling Services, Inc.*, 764 F.2d 300, 304–05 (5th Cir.1985); *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984). Unlike the "featherweight" standard of causation in a Jones Act claim, the standard in an unseaworthiness claim is "proximate cause in the traditional sense." *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir.1983). As the district court instructed the jury without objection by either side, proximate cause means that (1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. *See Alverez v. J. Ray McDermott & Co., Inc.*, 674 F.2d 1037, 1042–43 (5th Cir.1982).

We conclude that Smith has not met the more demanding burden of showing proximate cause as a matter of law on his unseaworthiness claim. A reasonable juror could have determined that Smith's fall was not a direct result nor a reasonably probable consequence of the lack of a railing on the exhaust pipe. Although Smith was indisputably on the pipe when he fell, and the lack of a railing must have played some part, no matter how slight, in causing the fall, the factual dispute at trial over the exact details of how Smith fell leave us unable to find that proximate cause was established as a matter of law. It is consistent for the same condition or defect to be a legally sufficient cause of an injury on a Jones Act negligence theory of liability but not on an unseaworthiness theory. *See Landry*, 731 F.2d at 302. We therefore hold that the district court's denial of Smith's directed verdict motion on the unseaworthiness claim was correct.

### V. APPELLATE REMEDY

Because Smith failed to move for judgment n.o.v., our role at this juncture is a limited one. We are without power to reverse and render; we may only reverse and remand. *See Cone v. West Virginia Pulp and Paper Co.*, 330 U.S. 212, 217–18, 67 S.Ct. 752, 755–56, 91 L.Ed. 849 (1947); *University Computing Co. v. Lykes-Youngstown*, 504 F.2d 518, 548 (5th Cir.1974); 5A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 50.12 (2d ed. 1985). Because the district court committed no error as to Smith's unseaworthiness or maintenance and cure claims, these issues need not be retried. However, we remand for a new trial on the issues of Jones Act negligence,[8] comparative negligence, and damages.[9]

---

6. Trans-World would have us conclude that impeachment of Smith's version of the fall produced evidence sufficient to uphold a finding of no causation even under the lenient Jones Act standard. While Trans-World was able to show Smith's memory for numerical information was not perfect (e.g. that he had made at least seven dollars an hour at a previous job instead of six dollars as he testified at trial) and that he estimated the length of the pipe at five feet when it was actually just under three feet, the cross-examination of Smith reinforced his prior direct and deposition testimony that he was standing on the pipe when he fell.

7. Smith's claim for damages was based on the alternate grounds of negligence and unseaworthiness. He could not recover cumulative damages under both the Jones Act and the general maritime law of unseaworthiness. *See McCarty v. Service Contracting*, 317 F.Supp. 629 (E.D.La.1970). We choose to reach this issue, however, in order to clarify that only the Jones Act claim need be addressed on remand.

8. Although we conclude that the district court should have directed a verdict for Smith, since no motion for judgment n.o.v. was filed, we have no power under *Cone* to do more than

The judgment is AFFIRMED in part, and REVERSED in part and REMANDED.

remand this case for what may be "the useless formality of another trial" on the Jones Act liability issue. *See Yorkshire Indemnity Co. v. Roosth & Genecov Production Co.,* 252 F.2d 650, 657–58 (5th Cir.1958) (citing *Garman v. Metropolitan Life Insurance Co.,* 175 F.2d 24, 28 (3rd Cir.1949)). When a motion for judgment n.o.v. is filed under Fed.R.Civ.P. 50(b), the discretion of the district court is called upon to determine in the first instance whether to grant a new trial or to enter judgment. *See Cone,* 330 U.S. at 215–16, 67 S.Ct. at 754–55. When no motion for judgment n.o.v. is filed, then an appellate court is constrained from exercising that discretion which should have been vested in the district court. *See id.* at 217–18, 67 S.Ct. at 755–56.

9. Smith's failure to move for new trial does not preclude ordering a new trial as a remedy for erroneous denial of his motion for directed verdict on the Jones Act claim. *See Gorsalitz v. Olin Mathieson Corp.,* 429 F.2d 1033, 1038 (5th Cir.1970), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972).