Paul WUESTEWALD, Plaintiff(s),

v.

FOSS MARITIME COMPANY, Shore Terminals LLC, Defendant(s).

No. C 02–3002 BZ.

United States District Court,
N.D. California.

May 11, 2004.

Lyle C. Cavin, Jr., Ronald H. Klein, Law Offices of Lyle C. Cavin, Jr., Oakland, CA, for Plaintiff.

John D. Giffin, Cara L. Meredith, Keesal, Young & Logan, San Francisco, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZIMMERMAN, United States Magistrate Judge.

Plaintiff seeks damages under general maritime law and the Jones Act, 46 U.S.C. § 688, from defendants Foss Maritime Company ("Foss") and Shore Terminals LLC ("Shore") for injuries plaintiff sustained after he fell from a ladder while attempting to access the SAN PEDRO (the "vessel" or "barge"), a barge owned and operated by Foss, from Shore's dock. Having considered and weighed all the evidence and having assessed the credibility of the witnesses, I now make these findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a):

### I. FINDINGS OF FACT

Plaintiff Paul Wuestewald, sixty years old, has been working in the marine industry for over thirty years, and as a tankerman for over 20 years. In 1996, he was employed by Foss as a certified tankerman. As part of his responsibilities, plaintiff loaded and unloaded bunker fuel at various terminals throughout the San Francisco Bay.

On October 16, 2001 Foss owned and operated the SAN PEDRO, a 186 foot-long barge inspected by the Coast Guard pursuant to 46 U.S.C. § 3301. *See* Joint Ex. 14. The SAN PEDRO is a "bunker barge" employed to carry cargoes of bunker oil used as fuel for sea-going ships. Around the periphery of the barge's steel deck is a five inch high steel ridge called the "coaming" that is located twenty-four inches from the edge of the vessel. Around the edge of the barge is a hemispherical "slip rail" which protrudes about 6 inches from the vessel.

On October 16, 2001, defendant Shore owned and operated a dock at a fuel oil loading terminal in Richmond, California (the "dock").

On October 16, 2001, plaintiff was working on the SAN PEDRO loading bunker fuel at Shore's terminal in Richmond, California. He was its only crew member. By approximately 5:40 p.m., the barge was fully loaded. Plaintiff returned to the dock to (1) check the draft lines, which measure how low the barge rests in the water,[1] (2) complete paperwork with Shore's personnel, and (3) return a radio earlier given by Shore to plaintiff during the loading or unloading process.

Shore does not ordinarily provide a gangway or a convenient ladder to access its dock. It was the custom and practice of Foss tankermen to use a portable ladder to access the dock and Foss barges were equipped with ladders for that purpose. It was also their custom and practice not to tie off the ladder at Shore's terminal, principally because of the risks associated with having a ladder fixed in

place on a barge that could move up or down. Captain Russell, who supervises the tankermen, admitted that there was nothing specific on the dock to which to tie a ladder. Three tankermen testified that they were unaware that a gangway was available upon request. It was undisputed that a gangway could be rigged to the SAN PEDRO.

The tide that evening was extremely low. After loading, the deck of the barge rested nine to twelve feet below the dock surface.[2] Consistent with his customary practice of accessing the dock, plaintiff braced the bottom of an aluminum ladder inside the side of the coaming facing the dock and leaned the ladder against the dock.[3] When plaintiff attempted to climb the ladder, it started to fall backwards because the angle was too acute. Plaintiff then moved the base of the ladder towards the center of the San Pedro and outside the coaming. I find that there was no suitable place against which to brace the ladder or to tie off the ladder at either end. Plaintiff climbed the ladder to the dock without difficulty and completed his

1. The parties disputed the necessity of returning to the dock to read the draft lines. According to the testimony of fellow tankerman and defense witness, Mike Higa, and defendants' expert, Captain Janecek, the draft could be read by laying across the deck, the coaming, and the slip rail and peering down over the side of the barge which is tied to the dock. I do not fault plaintiff for instead returning to the dock to read the draft lines. *See* Joint Ex. 35.

2. The parties disputed whether this distance was 9 feet, as defendants claimed, or 10 to 12 feet as plaintiff claimed. Several defense witnesses testified to a measurement taken long after the accident from which they concluded that the distance was approximately 9 feet. The court also received testimony about a 4 to 1 rule; for every 4 feet a ladder rises it should be one foot from the wall. The testimony is undisputed that Mr. Wuestewald initially tried to brace the ladder against the coaming which is 2 feet from the edge of the barge and

that the barge was approximately 1 to 1 ½ feet from the edge of the dock, for a total of 3 to 3 ½ feet. He also testified that in this position the angle was too acute for him to safely climb the ladder. The 4 to 1 rule suggests that if the barge was only 9 feet below the dock plaintiff would have had no trouble climbing up a ladder that was braced 3 to 3½ feet from the dock.

3. The parties spent considerable time at trial disputing whether the ladder was twelve feet, fourteen feet, or sixteen feet. Plaintiff urges me to infer that the ladder was too short for its intended purpose from defendants' failure to preserve and produce the ladder. *See* Plaintiff's Supplemental Brief dated April 23, 2004, p. 7. I decline to do so because plaintiff has failed to prove that it was the length of the ladder that caused it to slip. I am troubled that Foss delegates to its tankermen the task of deciding what length of ladder to purchase for the barge.

tasks. Before descending, plaintiff tested the ladder with his left foot. The ladder felt secure. When he placed his right foot on the rung the ladder slipped from the bottom, causing him to fall approximately nine to twelve feet to the deck of the San Pedro. No evidence was presented on what caused the ladder to slip.

The edge of the dock had two 12″ by 12″ wooden "stringers" separated from a cement curb on the dock by a twenty-four inch gap. There were no cleats or hooks affixed to the stringers to which a ladder could be tied or secured. A permanent steel ladder was affixed to the side of the dock approximately eighteen to twenty-four inches from and perpendicular to the side of the barge. To use the ladder, plaintiff would have had to step over both mooring lines and eighteen to twenty-four inch rubber fenders surrounding the barge and swing out over the water using one hand to grasp the ladder. It is undisputed that this is an emergency ladder and that the bottom rungs are slippery due to the presence of barnacles and moss.

Foss calls on several terminals in the San Francisco Bay Area and is aware of the customary use of ladders to access the docks. Foss never conducted systematic visits to these terminals to investigate conditions affecting dock accessibility or to verify the feasibility of following its own ladder safety guidelines.[4] It did not arrange for Shore to provide a gangway when needed or for Shore personnel to assist Foss personnel in accessing the dock. It did not ask Shore to provide cleats or hooks on the dock to which ladders could be tied. It provided no guidance for safe access by the tankermen other than what is stated in Foss safety manuals. Captain Russell testified that prior to the accident, he conducted regular safety meetings but never specifically addressed how to safely use ladders in dangerous circumstances, on the grounds that its tankermen were experienced.

Defendants argued they should be absolved from any liability because plaintiff was negligent in failing to (1) ask Shore employees to lower a gangway, (2) secure the ladder at the top to hoses on the dock or to a steel threaded bolt on the back of the stringers, (3) secure the ladder at the bottom to a cleat, (4) ask Shore personnel to hold the ladder or tie it off from the top before ascending or descending, (5) use a bucket to transfer required paperwork rather than delivering it personally, (6) wait for the tug crew to hold the ladder before accessing the dock, and (7) throw a line from the base of the barge up and through the twelve inch gap in the dock space and then grabbing the line with a rod and securing it to the ladder.

■ I decline to fault plaintiff for failing to employ many of the suggested alternatives. The majority are not included in Foss's Safety and Loss Manual or in its Tank Barge Operations Manual. Some involve greater risk than plaintiff's use of a ladder. Foss's suggestions were not provided to tankermen at the safety meetings conducted by Captain Russell. They also fail to appear on the Coast Guard "Report of Marine Accident Injury or Death" completed by Captain Russell immediately following the accident. *See* Joint Ex. No. 16, p. 2.

---

4. Guidelines applicable to ladder safety are included in the Foss Tank and Barge Manual, which advise tankermen "[w]hen using ladders, make sure they are set securely, and *if possible*, attached or tied at the top . . ." Joint Ex. 32 (emphasis added). A Foss publication entitled "Slips, Trips, and Falls" also advises employees to "[h]ave someone hold the ladder at the bottom of [sic] added support", not a simple task on a barge with only one crewmember. Joint Ex. 26.

■ Foss defends its policies on the grounds that it is impossible to instruct its tankermen on every imaginable hazard. Safe dock access and ladder safety, however, fall within the range of expected problems encountered when loading or unloading the barge. The effect of low tides on dock accessibility, while infrequent, is regular and expected. I do fault plaintiff, when faced with an unusually low tide which prevented him from bracing his ladder against the coaming, for not seeking assistance from Shore personnel, either to provide him with a gangway or to help him with the ladder. While Foss had not arranged for such assistance, Shore personnel testified that they helped when asked. I assign to plaintiff 20% of the fault for this accident.

The fall caused plaintiff to fracture his right heel, sustain a mild vertebrae compression fracture, and injure his right hip and hand. The pain in his hand has largely resolved since the accident, and his hip, back and foot pain are being treated with anti-inflammatory and pain medication, when necessary, at a cost of $90.00 per month. As a result of his injuries, plaintiff has difficulty sitting for extended periods of time and can only walk for two to three blocks due to the pain in his heel. He is unable to grip heavy objects with his hands. Prior to the accident, plaintiff enjoyed fishing, bowling, and playing with his grandchildren. He also performed various household chores, such as painting. His injuries now prevent him from participating in many of his customary activities.

I find that plaintiff will likely have to undergo surgery to fuse the subtalar joint on his right foot. I also find that having deferred the surgery thus far, it is not likely plaintiff will undergo the surgery in the next few years such that it would prevent him from working. I find that it is not likely that plaintiff will join a gym or health club as part of any treatment for his injuries. I find that plaintiff is not likely to have hip surgery to remedy his bursitis.

It is undisputed that plaintiff will be unable to return to work as a tanker man. I find he is physically able to perform some semi-sedentary work that permits him to alternate between sitting and standing, but will require some vocational retraining.

## II. CONCLUSIONS OF LAW

Subject Matter jurisdiction exists over this case by virtue of the Jones Act, 46 U.S.C. § 688, and general maritime law pursuant to 28 U.S.C. § 1333. As a merchant seaman, plaintiff is entitled to the protections of the Jones Act and general maritime law.

■ Under the Jones Act, Foss has a duty to use reasonable care to ensure that plaintiff has a safe place to work. *Havens v. F/T Polar Mist,* 996 F.2d 215, 218 (9th Cir.1993). To recover under the Jones Act, plaintiff must prove that the employer's negligence played any part, no matter how slight, in causing his injuries. *Id.; Ribitzki v. Canmar Reading & Bates, Ltd.,* 111 F.3d 658, 662 (9th Cir.1997) (describing "featherweight" causation standard for negligence under the Jones Act). Liability attaches only if the employer or its agents either knew or should have known of the dangerous condition. *Id.* An employer is charged with constructive notice if, in the exercise of reasonable care, it should have known about or discovered the alleged dangerous conditions. *Id.*

■ I conclude that Foss was negligent by failing to provide plaintiff with a safe means of access to and from the dock under the circumstances that existed at the time and place of his accident. Foss did not investigate conditions at Shore that affected dock accessibility at low tide despite its knowledge that tankermen rou-

tinely used ladders to access docks. It did not adequately train its employees in ladder safety, especially in dangerous conditions, or discuss specifically the various alternative access methods asserted at trial. By providing only a ladder, and not a ladder plus an additional precaution to ensure plaintiff's safety, such as an additional crewmember or arranging for a Shore employee to provide a gangway or hold the ladder, Foss's conduct fell below the standard of care and caused plaintiff's injuries.

■ Where a seaman's injuries are attributable, at least in part, to a vessel being in violation of a Coast Guard safety regulation designed to protect the class of individuals to which seaman belonged and to prevent the type of injury suffered by the plaintiff, the vessel owner is negligent *per se* and a defense of comparative negligence is unavailable. *Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d 514, 517 (9th Cir.1996) (reversing district court's reduction in damages based on plaintiff's comparative negligence where injuries were caused by violation of Coast Guard regulation by vessel owner); *Kopczinski v. THE JACQUELINE*, 742 F.2d 555 (9th Cir. 1984) *cert. denied* 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (9th Cir.1984); *Smith v. Trans–World Drilling Co.*, 772 F.2d 157, 160 (5th Cir.1985).

■ As an independent basis for Foss's negligence, I conclude that Foss violated Coast Guard regulation 46 C.F.R. § 42.15–75. This regulation, entitled "Protection of the Crew", requires vessels to provide "satisfactory means" of moving around the vessel during the performance of the "necessary work of the vessel." *See* 46 C.F.R. § 42.15–75(d). The regulation specifically mentions a gangway, but not a ladder, as one of the enumerated "satisfactory means". *Id.* By not providing a satisfactory means of access from the barge to the dock, such as a gangway, Foss violated the Coast Guard regulation.

At trial, plaintiff established the elements for negligence *per se* under the Jones Act. *Fuszek*, 98 F.3d at 516 *citing Smith v. Trans–World Drilling Co.*, 772 F.2d 157, 160 (5th Cir.1985). Defendants did not dispute the applicability of the Coast Guard regulation to plaintiff as a tankerman. Entering and exiting the barge during the loading or unloading process is a central part of the "necessary work" of a tankerman. The purpose of the regulation is clearly to prevent falls and injuries while crewmembers are working. Foss offered no evidence which would excuse its failure to provide satisfactory access, other than contending that a ladder is "satisfactory" under the terms of the regulation. *Reyes v. Vantage S.S. Co., Inc.*, 558 F.2d 238, 243 (5th Cir.1977) (failure to comply with safety regulations may be excused where non-compliance was due to an emergency situation, or where compliance would be more dangerous than non-compliance). Neither customary use of ladders by tankermen nor Foss's belief that ladders are safe excuses the violation that occurred here. *Smith*, 772 F.2d at 161. Had Foss provided satisfactory means of access, plaintiff would not have fallen and injured himself. Based on the foregoing, I find that Foss was negligent as a matter of law.

■ Under the "seaworthiness" doctrine, Foss has a non-delegable duty to provide a vessel that is reasonably safe, including work places, equipment, and access to and from the vessel. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Ribitzki*, 111 F.3d at 664; *Reyes v. Marine Enterprises, Inc.*, 494 F.2d 866, 869 (1st Cir. 1974) (seaworthiness extends to "the owner's duty to supply his crew with a suitable ship and equipment ... [including a] suitable means to board and disembark. The duty thus extends to the gangway by

whomever supplied, owned, or controlled"); *Sherfy v. BARGE MARIN HORIZON,* 76 F.Supp.2d 1054, 1056 (N.D.Cal.1999). The shipper must furnish a vessel and appurtenances that are reasonably fit for their intended use. *Mitchell,* 362 U.S. at 550, 80 S.Ct. 926. The shipowner's actual or constructive knowledge of an unseaworthy condition is not essential to its liability. *Id.* The employer is strictly liable if plaintiff can show that the unseaworthy condition played a substantial part in bringing about the injury. *Faraola v. O'Neill,* 576 F.2d 1364, 1366 (9th Cir.1978).

■ For the same reasons supporting a finding of Foss's negligence under the Jones Act, I find that the SAN PEDRO was unseaworthy. *See Weeks v. Alonzo Cothron, Inc.,* 466 F.2d 578, 581 (5th Cir. 1972) (finding breach of seaworthiness doctrine where shipowner failed to require a safety procedure to notify crew immediately that underwater worker was in distress).

■ Foss's violation of a Coast Guard regulation also renders the SAN PEDRO unseaworthy as a matter of law, but does not necessarily establish causation required to recover under his unseaworthiness claim. *Smith v. Trans–World Drilling Co.,* 772 F.2d 157, 162 (5th Cir. 1985) (violation of safety regulation sufficient to trigger the "featherweight" standard of causation under Jones Act negligence, but not necessarily sufficient to trigger "proximate cause in the traditional sense" required to render a vessel unseaworthy). To establish causation under the seaworthy doctrine, plaintiff must show that the unseaworthiness (1) played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. *Id.; Alverez v. J. Ray McDermott & Co., Inc.,* 674 F.2d 1037, 1042–43 (5th Cir.1982); *Cresap v. Pacific Inland Navi-*

*gation Co.,* 2 Wash.App. 548, 469 P.2d 950, 954 (1970). Comparative negligence principles may act to reduce plaintiff's recovery under his seaworthiness claim. *Knight v. Alaska Trawl Fisheries, Inc.,* 154 F.3d 1042, 1047 (9th Cir.1998) (stating that "[m]aritime law has [ ] long applied the rule of comparative fault in a seaman's unseaworthiness action against a shipowner"); *Phipps v. S.S. Santa Maria,* 418 F.2d 615, 616–17 (5th Cir.1969); *Marine Solution Services, Inc. v. Horton,* 70 P.3d 393 (Alaska 2003).

I find that Foss's failure to provide a seaworthy vessel was a substantial cause and a direct result in causing plaintiff's injury. But for Foss's failure, plaintiff would not have been injured.

■ Plaintiff failed to establish a breach of a duty of care owed to him by Shore. A dock owner's duty to seamen using the dock is defined by the application of state law, and not maritime law. *See Victory Carriers, Inc. v. Law,* 404 U.S. 202, 206–07, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) (stating that "the gangplank has served as a rough dividing line between state and maritime regimes" with piers and docks "deemed extensions of land"); *Florida Fuels, Inc. v. Citgo Petroleum Corp.,* 6 F.3d 330, 332 (5th Cir.1993). Under California law, Shore owes plaintiff a duty of care applicable to business invitees. *See* Cal. Civ.Code § 1714 (2004) (liability for injuries to another caused by failure to exercise ordinary care). This duty obligates Shore to provide a dock that is reasonably safe and to warn of hidden dangers known to the owner and not reasonably apparent to the invitee. *Id.; Freeman v. Nickerson,* 77 Cal.App.2d 40, 48, 174 P.2d 688 (1946). Plaintiff did not present any evidence that the dock was inherently unsafe, or that Shore failed to warn of a hidden danger. Shore did not have a duty to assist plaintiff or to provide

a safe means for accessing its dock from the barge. Even assuming that Shore breached a duty, plaintiff did not establish that the breach was the proximate cause of his injuries. It is undisputed that plaintiff was not injured while on Shore's dock, but when the ladder slipped on the deck of the barge. There was no evidence that the ladder slipped because Shore's dock was defective. In the absence of a breach of Shore's duty, or a causal connection between a breach and his injuries, I find that Shore was not negligent.

■■■ I find that plaintiff did not establish Shore's breach of the implied warranty of workmanlike performance. *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *Sims v. Chesapeake and Ohio Railway Co.*, 520 F.2d 556, 561 (6th Cir. 1975).[5] Plaintiff did not offer sufficient evidence of a contract, either express or implied, between Shore and Foss which gives rise to a duty of workmanlike performance, such as an obligation by Shore to assist Foss tankermen during loading. In fact, Shore employees testified that Shore did not require them to assist Foss tankermen during the loading or unloading operation. Unlike *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 733 (4th Cir.2000), upon which plaintiff relies, plaintiff was not injured by a third party brought on board the vessel who created a dangerous condition that caused the injury.

## III. DAMAGES

Having concluded that Foss was negligent and failed to provide a seaworthy vessel, I award plaintiff $835,236.00 in damages calculated as follows:

(1) $75,000.00 in general damages for past pain and suffering plus prejudgment interest pursuant to 28 U.S.C § 1961(a) from the date plaintiff filed his complaint;

(2) $175,000.00 in general damages for future pain and suffering;

(3) $216,011.00 in past economic losses through April 2004 less $25,000 already received by plaintiff from Foss,[6] plus prejudgment interest pursuant to 28 U.S.C § 1961(a) from the date plaintiff filed his complaint. This figure represents lost wages through April 2004 based on Dr. Ogus's Case I–B, Alternative II report. *See* Joint Ex. 21;

(4) $360,885.00 in future economic losses commencing in May 2004 based on the assumption that plaintiff will begin part-time work in July 2004 and work until age 66.

(5) $2,340 in future vocational retraining;

(6) $31,000 in future medical costs for the anticipated surgery on his ankle and for medication.

## FINAL JUDGMENT

This action came on for trial before the Court on April 19, 2004. The issues having been duly tried and Findings of Fact and Conclusions of Law having been duly rendered, **IT IS ORDERED AND ADJUDGED** that the plaintiff, Paul Wuestewald, recover of the defendant, Foss Maritime Company, the sum of $835,236.00 with interest and costs as permitted by

---

**5.** In *Sims* the Sixth Circuit stated that "[t]he nature of the services performed by the wharfinger determines the extent of this warranty ... The implied warranties of a wharfinger relate to the conditions of berths and the removal of dangerous obstructions or giving notice of their existence to vessels about to use the berths ... A wharfinger also owes a duty to furnish a safe means of egress and ingress to berthed ships." *Id.*

**6.** The parties stipulated at trial that Foss shall be credited $25,000 for any judgment awarding plaintiff past economic losses.

law. **IT IS FURTHER ORDERED AND ADJUDGED** that plaintiff take nothing from defendant Shore Terminals LLC, that his action against Shore is dismissed on the merits and that Shore recover its costs of action.